## Coffin v. Medina Revenue Company LLC

C.P. of Crawford County, no. A.D. 2008-526

*Herbert Butcher,* for plaintiff.
*Robert C. LeSuer,* for defendant.

SPATARO, *J.,* March 12, 2010—Plaintiff, George W. Coffin, has filed this declaratory judgment action against three entities, Medina Revenue Company LLC, Medina

Resource Development Company LLC and estate of Alec W. Styborski. The parties have tacitly acknowledged that Medina is the actual party in interest because the other named defendants have no ownership interest in the lands at issue. Medina has filed a motion for partial summary judgment as to Count II of the second amended complaint that we now address.

Count I of the second amended complaint seeks declaratory judgment, having the effect of terminating the defendants' interest, if any, in a certain document referred to as the "ratification agreement" that relates to an oil and gas well, referred to as the "Styborski no. 1 well" and termination of any interest the defendants have in the oil and gas rights affecting this land. The second count seeks declaratory judgment, having the effect of terminating a certain right-of-way agreement between Coffin and Troyer Gas & Oil, dated November 11, 1985 and recorded in Crawford County agreement book 128, page 870.

On July 19, 1972, Otto and Opal Schultz conveyed to Consolidated Gas Supply Corporation an oil and gas lease (Schultz lease). The lease covered 54 acres of land in Rockdale Township now owned by Coffin. A "declaration of pooling", dated May 6, 1982, was filed by Consolidated Gas that pooled together various leases, including the Schulz lease, with a certain lease by Alex W. Styborski and Marion L. Styborski, along with other lessors. The Styborski no. 1 well was then drilled upon the land owned by the Styborskis. The operator of the oil and gas well was a company called Kaltsas Oil Company Inc. Subsequently, on or about October 29, 1982, Mr. and Mrs. Schultz sold their property to Coffin. On August 25, 1983, Coffin entered into an oil and gas lease

with C & C Troyer Brothers (Troyer lease), which over lapped the Schultz lease which had been placed in the pool that included the Styborski no. 1 well.

Coffin and the Kaltsas Oil Company executed a document entitled a ratification agreement dated November 5, 1985. The ratification agreement refers to the Schultz lease of July 19, 1972 and represents Coffin's agreement to be legally bound and governed by the terms of the Shultz lease and to ratify those terms. This conflicts with the Troyer lease and we assume that the lessee of the Troyer lease acknowledged the primacy of the Schultz lease because nothing was ever done to enforce the Troyer lease that has now expired. The ratification agreement refers to an assignment of "certain rights" to Kaltsas under the Schultz lease by Consolidated Gas while indicating that the Schultz lease is actually "owned" by CNG Development Company. The ratification agreement expressly nullified the pooling declaration of May 6, 1982, except to the extent that the Styborski no. 1 well, already in existence, was permitted to remain. The apparent intent was to prevent Kaltsas and its principals from drilling any other wells under the pooling declaration. The ratification agreement provides a formula by which Coffin was to receive 35 percent of the one-eighth royalty received from the production of gas and/or oil from the Styborski no. 1 well. The term of the lease was to continue for "so long thereafter as oil and gas is produced by Kaltsas Oil Company or its assignee, in commercially reasonable quantities from said premises from a *new well* to be drilled hereinafter by Kaltsas Oil Company or its assignees." (emphasis added)

The ratification areement states that if no well is completed on or before January 1, 1987 then the lease would

terminate as to all parties, including CNG Development Company and/or any assignees, although it is unclear as to who these other parties are. As an alternative to the automatic termination, Kaltsas Oil Company or its assignees were permitted, on or before that date, to pay or tender to Coffin the sum of $1,000, which would operate as a delay rental and extend the term for 12 months for the drilling of a well. The agreement describes how the Kaltsas Oil Company will lay a pipeline from any well drilled on the leased premises to the Coffin house to provide for free gas, along with other connection provisions. Paragraph 7 of the ratification agreement states that "[I]nsofar as the well contemplated herein shall be tied into a certain gas transmission line owned by C & C Troyer Brothers for which no valid right-of-way agreement has been made, the lessor agrees to enter into a right-of-way agreement with *C & C Troyer Brothers* for the purpose of allowing the continued existence of said transmission pipeline provided that the consideration paid for said right-of-way agreement is in the amount of $1.50 per running foot." (emphasis added)

Subsequently, the right-of-way agreement was entered into between Coffin and Troyer Gas & Oil, (not C & C Troyer Brothers) dated November 11, 1985, six days after the date appearing on the ratification agreement. It is this right-of-way agreement that Medina contends is not assailable by Coffin's declaratory judgment action because of the parol evidence rule. Both the right-of-way agreement and the ratification agreement were recorded on the same day, November 15, 1985. The right-of-way agreement makes no reference to the ratification agreement. In endeavoring to analyze the ratification agreement and the right-of-way agreement together, it appears

that Kaltsas became the assignee of "certain rights" of the Consolidated Gas Supply Corporation to the Schultz lease and then agreed to modify the declaration of pooling, effectively eliminating any future pooling, in order to recognize the continuing existence of the Styborski no. 1 well. Apparently, the intent was for Kaltsas to drill a well on property owned by Coffin, which was not to be included in the declaration of pooling. Coffin obligated himself to enter into the right-of-way agreement with C & C Troyer Brothers, however, C & C Troyer Brothers is not a party to either the ratification agreement or the right-of-way agreement, so it would appear, on its face, that Coffin's efforts to have the right-of-way agreement declared void would be problematic because the right-of-way agreement contains no conditions that would, if unfulfilled, result in a termination of the right-of-way agreement.

From 1985 forward, these leases changed hands many times, including, Kenco Oil and Gas, Puma Energy, D.L. Schoen & Associates, TQI Oilfield Service Inc. and Troyer Gas and Oil (different from C & C Troyer Brothers). Medina did not enter the chain of title involving Troyer until around 1995. (Defendant's new matter, averment 94.)

Sometime in 1986, Kenco Oil and Gas Company, a successor to Kaltsas, and a predecessor in interest to Medina, drilled an oil and gas well on Coffin's property, referred to as the "Coffin no. 1" well. In April of 1986, the Coffin no. 1 well was connected to the gas transmission line referred to in the right-of-way agreement with Troyer Gas & Oil. Around April 9, 1999, an agent of Puma Energy disconnected the Coffin no. 1 well from the gas transmission line, according to Coffin's allega-

tions, and this well has never been put back into production.

Coffin claims that he entered into the right-of-way agreement with Troyer Gas & Oil on the condition that the Coffin no. 1 well was tied into that transmission line. Coffin argues that it was an implied condition of the right-of-way agreement that the Coffin no. 1 well remain tied to that transmission line, and that the disconnection of the Coffin no. 1 well by an agent from Puma terminated the right-of-way agreement. Medina contends that Coffin cannot establish the existence of an implied condition because the parol evidence rule precludes the introduction of evidence regarding the intent of the parties to an agreement where the agreement on its face is clear and unambiguous. Coffin, however, argues that the right-of-way agreement must be read in conjunction with the ratification agreement. Coffin would also like to prove that Kaltsas acted as an agent for Troyer Gas & Oil.

As has been frequently stated by the courts of this Commonwealth: "Summary judgment may be entered only in those cases where the record clearly demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Mullin v. PennDOT,* 582 Pa. 127, 135, 870 A.2d 773, 778 (2005). "Further, the record must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Kilgore v. City of Philadelphia,* 553 Pa. 22, 25, 717 A.2d 514, 516 (1998). The right to summary judgment must be clear and free from doubt. *Id.* at 25, 717 A.2d at 515-16.

Pennsylvania Rule of Civil Procedure 1035.2 reads:

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law:

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2.

The two concepts behind a motion for summary judgment are: "(1) the absence of a dispute as to any material fact and (2) the absence of evidence sufficient to permit a jury to find a fact essential to the cause of action or defense." *Id.* at explanatory comment—1996; *Young v. PennDOT,* 560 Pa. 373, 375-76, 744 A.2d 1276, 1277 (2000).

We will first address Coffin's argument that Medina's motion for partial summary judgment is premature because discovery is not yet complete. Coffin argues that discovery in this matter is incomplete and that the disclosure of additional issues of fact to be litigated may arise with regard to the relationship between Troyer and Kaltsas, which is relevant because Medina currently owns interests that arose from the Kaltsas and Troyer leases. Coffin contends that the opportunity must be

given through discovery to determine whether or not Kaltsas was acting as Troyer's agent in persuading Coffin to enter into the right-of-way agreement with Troyer. (Plaintiff's answer to defendant's motion for partial summary judgment, ¶13.)

We note that Pa.R.C.P. 1035.2 contemplates that discovery has been completed; however, for the purpose of deciding whether to grant partial summary judgment on the issue before this court, no further discovery is needed. This court issued a memorandum and order with regard to defendants' preliminary objections on September 16, 2008. Ongoing discovery for the limited issue before this court is unnecessary as we are called to interpret the right-of-way agreement, and decide whether the ratification agreement should be read in conjunction with the right-of-way agreement. These documents are both of the record before this court. Any further extrinsic evidence to these documents obtained through further discovery is precluded from this court's consideration by the parol evidence rule as will be discussed *infra*.

We now decide whether the parol evidence rule precludes this court from considering evidence outside of the terms contained in the right-of-way agreement. Medina contends that the ratification agreement is extrinsic to the right-of-way agreement and is barred by the parol evidence rule. Coffin argues that parol evidence is evidence of oral statements, while extrinsic evidence is evidence relating to an agreement, but not appearing on its face, because it comes from alternate sources. Coffin states that while the parol evidence rule can operate to exclude both parol evidence and extrinsic evidence, before extrinsic evidence is precluded by this rule, it must be determined whether the writing evidencing the right-

of-way agreement was an integrated contract representing a final and complete expression of the agreement.

The Pennsylvania Supreme Court has comprehensively explained the parol evidence rule as follows:

"Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. . . . All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence. . . . The writing must be the entire contract between the parties if parol evidence is to be excluded, and to determine whether it is or not the writing will be looked at, and if it appears to be a contract complete within itself, 'couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing.'" *Gianni v. R. Russell & Co. Inc.,* 281 Pa. 320, 323, 126 A. 791, 792 (1924). (citations omitted)

The Pennsylvania Supreme Court went on to further explain the parol evidence rule as follows:

"An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.

"Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. . . . One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake. . . . In addition, where a term in the parties' contract is ambiguous, 'parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.'" *Yocca v. Pittsburgh Steelers Sports Inc.,* 578 Pa. 479, 498, 854 A.2d 425, 436-37 (2004). (citations omitted) (footnote omitted)

Turning to the present matter, the right-of-way agreement does not contain an integration clause; therefore, we must determine whether the right-of-way agreement is the integrated, final and complete expression of the parties' agreement. Coffin entered into a right-of-way agreement for the gas transmission line with Troyer Gas & Oil. The right-of-way agreement is a one-page document that sets forth the terms of the agreement whereby Coffin granted to Troyer Gas & Oil the right-of-way to lay, maintain, operate, re-lay and remove a gas transmission line on Coffin's property for, and in consideration of $1. The location of the gas transmission line is clearly set forth in the right-of-way agreement, and Coffin, along with his heirs and assigns, reserved the right to use and enjoy the premises except for the uses and purpose granted to Troyer Gas & Oil. Troyer Gas & Oil agreed

to repair any damage resulting from the installation of the gas transmission line, and the right-of-way agreement was signed by Coffin and a representative for Troyer Gas & Oil, in the presence of a witness, and notarized. The right-of-way agreement is clearly a complete and final expression of the parties' agreement, whereby Coffin granted Troyer Gas & Oil the right to install and maintain a gas transmission line on Coffin's property.

As noted earlier, Coffin in his second amended complaint for declaratory relief sets forth in Count II the claim that Coffin entered into a right-of-way agreement with C & C Troyer Brothers for the gas transmission line on the condition that the Coffin no. 1 well be tied into that transmission line. Furthermore, Coffin claims that it was an implied condition of the right-of-way agreement that the Coffin no. 1 well remained tied into the transmission line. A close reading of the right-of-way agreement establishes that there is no mention of a condition that the Coffin no. 1 well was to be tied to the transmission line, and there is nothing indicating any sort of implied condition that the Coffin no. 1 well must remain tied to the transmission line. We also note that the right-of-way agreement contains no reference to the ratification agreement; nor does the ratification agreement refer to the right-of-way agreement. Both recorded documents stand on their own.

A finding that the right-of-way agreement is the entire contract between Coffin and Troyer Gas & Oil requires a determination that any evidence of any previous oral or written negotiations or agreements involving the same subject matter as the right-of-way agreement is inadmissible to explain or vary the terms of the contract under the parol evidence rule. *Yocca,* 578 Pa. at 498, 854 A 2d

at 436-37. There are exceptions to this general rule, only one of which may be applicable to this matter, as there have been no averments that certain terms were omitted from the right-of-way agreement because of fraud, accident or mistake. Parol evidence may be admissible in cases where there exists ambiguity as to the meaning of the covenants in a contract, and whether the ambiguity is the result of the language in the contract, or because of extrinsic or collateral circumstances, is of no consequence. *Id.* at 498-99, 854 A.2d at 437.

Coffin argues that the crossed-out terms in the right-of-way agreement create an ambiguity in this matter; therefore, this court may consider extrinsic evidence in the form of the ratification agreement in determining whether an implied condition existed that nullified the right-of-way agreement upon the disconnection of the gas transmission line from the Coffin no. 1 well. The crossed-out language referred to by Coffin in the right-of-way agreement is contained in the covenant whereby Coffin granted to Troyer Gas & Oil, "its successor and assigns, the right-of-way to lay, maintain, operate, \*\*\*\*\*\*\*\*\*, re-lay and remove a buried pipeline for the transportation of gas in, on, over and through grantor's land . . . ." (Second amended complaint for declaratory relief, exhibit H.) Coffin crossed-out the small portion from the covenant above, which is evidenced by his initials. The right-of-way agreement contained no other instances where Coffin crossed-out or altered language contained in the covenants.

In *Perrige v. Horning,* the Superior Court dealt with a situation where there were crossed-out and initialed terms by the parties to an agreement prior to the closing on a sale for land. *Perrige v. Horning,* 440 Pa. Super. 31,

37, 654 A.2d 1183, 1185 (1995). The crossed-out and amended handwriting in the sales agreement was contained in the "addendum to agreement of sale," where there were several typewritten conditions. *Perrige,* 440 Pa. Super. at 37, 654 A.2d at 1186. The addendum contained a condition that stated that the property retained by the defendants was to be used for agricultural purposes. *Id.* The plaintiffs in this case had purchased a certain tract of land, adjacent to a tract of land owned by the defendants, with the condition that the tract of land owned by the defendants would only be used for agricultural purposes. *Id.* That condition was crossed-out entirely in the addendum prior to the execution of the agreement because counsel for the defendants indicated that such a condition was unnecessary. *Id.* at 41, 654 A.2d at 1188. Subsequent to the sale agreement being executed, the defendants completed and submitted a subdivision plan to sever the tract of land for the purpose of creating and selling residential lots. *Id.* at 37, 654 A.2d at 1186.

The plaintiffs filed for injunctive relief in an effort to enforce the restrictive covenant and enforce their right to live next to land used for agricultural purposes, as the defendants had indicated would be the case. *Id.* The trial court sustained the defendants' preliminary objections and held that the plaintiffs lacked standing, and that the agreement did not create restrictive covenants enforceable in equity. *Id.* at 38-39, 654 A.2d at 1187. The Superior Court reversed the trial court and found that the removal of the restrictive covenant from the agreement created an ambiguity, and that although such covenants are to be construed in light of their language, their subject matter, the intent or purpose of the parties, and the conditions surrounding their execution, where an ambiguity

exists the court may consider extrinsic evidence. *Id.* at 41, 654 A.2d at 1188.

Although it is clear that crossing out language from an agreement may at times create an ambiguity such that the exception to the parol evidence rule may be invoked, the matter before us does not involve a similar situation to that in *Perrige, supra.* The right-of-way agreement does not contain any ambiguities with regard to a restrictive covenant whereby the right-of-way is terminated upon the removal of the gas transmission line from Coffin's well because the plain meaning of the right-of-way agreement indicates that no such conditions exists, impliedly or otherwise.

In *Steuart v. McChesney,* the Supreme Court reviewed an agreement in the form of a right of first refusal, and discussed the plain meaning approach to interpreting contracts. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659 (1982). The Supreme Court summarized the plain meaning rule as follows:

"[T]he rationale for interpreting contractual terms in accord with the plain meaning of the language expressed is multifarious, resting in part upon what is viewed as the appropriate role of the courts in the interpretive process: '[T]his court long ago emphasized that "[t]he parties [have] the right to make their own contract, and it is not the function of this court to re-write it, or to give it a construction in conflict with . . . the accepted and plain meaning of the language used." '" *Steuart,* 498 Pa. at 50, 444 A.2d at 662, citing *Hagarty v. William Akers Jr. Co.,* 342 Pa. 236, 20 A.2d 317 (1941).

In reviewing the right-of-way agreement, the language used in the agreement is express and clear, and there is

no basis to refer to extrinsic evidence to interpret the terms of the agreement.

The right-of-way agreement on its face indicates that Coffin granted to Troyer Gas & Oil the perpetual right-of-way for a gas transmission line. There are no conditions that limited the duration of the right-of-way. Although it may have been sensible for Coffin to include such a limitation in the right-of-way agreement, it is not the function of this court to re-write the agreement entered into between Coffin and Troyer Oil & Gas. The Supreme Court in *Steuart* expressed the importance of the plain meaning doctrine as follows:

"[R]esort to the plain meaning of language hinders parties dissatisfied with their agreement from creating a myth as to the true meaning of the agreement through subsequently exposed extrinsic evidence. Absent the plain meaning rule, nary an agreement could be conceived, which, in the event of a party's later disappointment with his stated bargain, would not be at risk to having its true meaning obfuscated under the guise of examining extrinsic evidence of intent. Even if the dissatisfied party in good faith believed that the agreement, as manifest, did not express the consensus ad idem, his post hoc judgment would be inclined to be colored by belief as to what should have been, rather than what strictly was, intended. Hence, the plain meaning approach to interpretation rests upon policies soundly based, and the judiciousness of that approach warrants reaffirmation." *Steuart,* 498 Pa. at 52, 444 A.2d at 663.

We note the practical necessity of applying the parol evidence rule in this matter. Coffin would like to offer testimony relating back to November 1985, 25 years ago,

to explain the interplay between the right-of-way agreement and the ratification agreement and to assert that Kaltsas was an agent for C & C Troyer Brothers or Troyer Oil & Gas. Not only do memories fade with time, but also there is a high likelihood that the persons Coffin spoke with are no longer available to testify. The defendant, Medina, is a successor in title and had no hand at all in the negotiations that resulted in the execution and filing of record of the ratification agreement or the right-of-way agreement.

Moreover, Medina, as a successor in interest, is entitled to rely upon the recording statutes and the plain meaning of language. Here, we have two separate documents within the chain of title of two separate entities, Kaltsas (ratification agreement) and Troyer Gas & Oil (right-of-way agreement). Even if an astute title searcher should happen to discover both documents while tracking through only one chain, the absence of any language in the right-of-way agreement to the ratification agreement would lead one to conclude that the right-of-way agreement stood on its own, notwithstanding the oblique reference in the ratification agreement to Coffin's obligation "to enter into a right-of-way agreement with C & C Troyer Brothers for the purpose of allowing the continued existence of said transmission pipeline provided that the consideration paid for said right-of-way agreement is in the amount of $1.50 per running foot." Even this quoted language, taken literally, does not condition the term of the contemplated "right-of-way agreement with C & C Troyer Brothers" to be limited to the duration of an oil and gas well that had yet to be drilled. The grantee in the right-of-way agreement is Troyer Gas & Oil, not C & C Troyer Brothers. To permit Coffin to have the court con-

sider such language as extrinsic evidence invites the very evil that the parol evidence rule is designed to eliminate—obfuscation "under the guise of examining extrinsic evidence of intent." *Steuart, supra.*

There are no ambiguities in the right-of-way agreement, and the plain meaning of the agreement does not include any of the conditions alleged to exist by Coffin; furthermore, because the right-of-way agreement is a clear and final expression of the intention of Coffin to grant to Troyer Gas & Oil a right-of-way for a gas transmission line, the parol evidence rule precludes this court from reviewing extrinsic evidence in our review and interpretation of the right-of-way agreement. There exists no genuine issue of material fact with respect to Count II in the plaintiff's declaratory judgment action; therefore, it is appropriate to grant partial summary judgment to the defendants.

For the reasons set forth in this memorandum, we now enter the following order:

## ORDER

And now, March 15, 2010, the defendant's motion for partial summary judgment is granted.